J. H. HART and Grant Springer v. THE VILLAGE OF WYND-
MERE, in Richland County, North Dakota, W. D. Springer,
Treasurer of the Village of Wyndmere, J. I. Hanson, Neil Camp-
bell, and Lars Olsgard, Trustees of the Village of Wyndmere, De-
fendants and Respondents, and North Dakota Artesian Well Com-
pany, a Corporation, Defendant and Appellant.

(131 N. W. 271.)

**Municipal Corporations — Village Warrants— Sale — Warranty.**

1. A seller of village warrants for value, by their sale, impliedly warrants
such securities to be the genuine and legal obligations of the village, and that
the same are not to the knowledge of the transferrer subject to set-off or
counterclaim.

**Municipal Corporations — Payment in Warrants — Payment in Cash — Con-
tract Obligation.**

2. The delivery by a village of its legal warrant in payment of a contract
providing for payment by it in cash is payment of such contract obligation.

**Municipal Corporations — Persons Dealing Presumed to Know Powers —
Nature.**

3. Those dealing with a municipal corporation, a village, are presumed to
know the extent of its powers, and cannot hold it liable because of represen-
tations or contracts of its officers concerning matters not legally within its
corporate powers.

**Actions — Change from Equitable to Legal — Jury.**

4. An action begun as an equitable action may, by subsequent pleadings,
be changed in nature to one at law properly triable on demand to a jury.

**Parties — Submission to Jurisdiction of Court — Waiver — Additional De-
fendants.**

5. Where summons and complaint were issued and served in an action
against a single defendant, and thereafter the parties stipulate in additional
defendants by the service of supplemental pleadings, naming them as such,
and such additional defendants so named voluntarily enter the action, serve
answers on codefendants and original plaintiff, and issue is joined thereon
between the original plaintiff and all of such defendants and between one
another, without an order of court bringing in such additional parties, but there-
after all parties to the action participate in the trial, offering their testimony,
resting, and moving for judgment, any objection thereafter made by such
additional parties to the jurisdiction of the court over them, or the subject-
matter of the action, comes too late, and they will be held to have submitted
in all things to the jurisdiction of the court the determination of their action,
and are bound by the verdict rendered and judgment entered thereon.

**Action — Change from Law to Equity — Joinder of Parties — Effect.**

6. If such action between the many parties, even though of conflicting interest, is but a combination of two or more separate actions at law, the action is not necessarily changed from one at law to one in equity, because of such voluntary consolidation of issues by the parties.

**Statutory Construction — Verdict — Signature of Foreman of Jury — Trial.**

7. The statutory provision, § 7031 of the North Dakota Revised Statutes of 1905, requiring that a verdict must be signed by the foreman of the jury, is directory, not mandatory, and an unsigned verdict properly rendered and received that would otherwise be valid is not invalidated by such statutory provision.

**Appeal and Error — Review — Error Without Prejudice.**

8. Where, at the close of the testimony as to certain issues in the case, the court might have directed a verdict or findings, any error not affecting the result as to such matters, uncontroverted by the evidence, or any issues to be found by the jury, is error without prejudice, and not ground for new trial.

**Evidence to Sustain Verdict — Municipal Corporation.**

9. Evidence examined and held sufficient to sustain the verdict rendered, and judgment ordered thereon.

Opinion filed April 7, 1911.

Appeal from District Court of Richland county, *Allen*, J.
Affirmed.

*C. W. Davis,* for appellant.

Only special questions arising from the pleadings, and controverted in the evidence, should be included in a special verdict. Mauch v. Hartford, 112 Wis. 40, 87 N. W. 816.

Verdict should be signed by the foreman. Rev. Codes 1905, § 7031.

Jurisdiction cannot be conferred by consent; it must be acquired under statutory process, or order of court pursuant to the statute. Ramsdell v. Duxberry, 14 S. D. 222, 85 N. W. 221; Ayers, W. & R. Co. v. Sundback, 5 S. D. 31, 58 N. W. 4; Woodward v. Stark, 4 S. D. 588, 57 N. W. 496; Smith v. Nicholson, 5 N. D. 426, 67 N. W. 296; Deardoff v. Thorstensen, 16 N. D. 355, 113 N. W. 616; Rev. Codes 1905, §§ 6824–6826.

*Wolfe & Schneller,* for respondents.

The transferrer of a chose in action warrants: A. That he has title. B. That it is not spurious, false, or counterfeit, C. When it is in writ-

ing, that there are no payments except as advised, and no legal offset because of any act of his. Giblin v. North Wisconsin Lumber Co. 131 Wis. 261, 120 Am. St. Rep. 1040, 111 N. W. 499; Scott v. Hix, 62 Am. Dec. 458, and notes, 2 Sneed, 192; French v. Turner, 15 Ind. 59; Delaware Bank v. Jarvis, 20 N. Y. 226, and cases cited; Keller v. Hicks, 22 Cal. 457, 83 Am. Dec. 78.

When parties litigated with consent of all concerned in the action, jurisdiction was absolute and complete; Rev. Codes 1905, § 6850; Haggarty v. Strong, 10 S. D. 585, 74 N. W. 1037; Anglo-American Packing & Provision Co. v. Turner Casing Co. 34 Kan. 340, 8 Pac. 403; Boyd v. Wallace, 10 N. D. 78, 84 N. W. 760; 3 Cyc. Law & Proc. pp. 515, 516, and notes; Ayers, W. & R. Co. v. Sundback, 5 S. D. 31, 58 N. W. 4; Blades v. Des Moines City R. Co. 146 Iowa, 580, 123 N. W. 1057; Ramsdell v. Duxberry, 14 S. D. 222, 85 N. W. 221, rehearing in 17 S. D. 311, 96 N. W. 132.

No signature to a verdict is necessary. 22 Enc. Pl. & Pr. p. 897; Miller v. Mabon, 6 Iowa, 456; Morrison v. Overton, 20 Iowa, 465; 22 Enc. Pl. & Pr. p. 898.

*W. S. Lauder,* for respondents, Village of Wyndmere and its officers.

Goss, J. This action was begun by the plaintiffs and respondents herein against W. D. Springer as treasurer of the village of Wyndmere as sole defendant, in which action a summons and verified complaint dated June 26, 1906, was issued and served upon the defendant therein named. The action was an equitable one asking for injunctional relief against the treasurer paying warrants and claims registered after the two warrants owned by plaintiffs, to the effect that the funds of the village be accumulated to meet the two warrants, aggregating $784.50 and interest, belonging to the plaintiffs. Accompanying the summons and complaint was an affidavit reciting substantially the same matters as the complaint, with the same statutory recitals as contained in the complaint as a basis for an injunctional order pending suit. Based upon the summons, complaint, and affidavit was an injunctional order enjoining the treasurer from making payments of claims and warrants registered subsequently to those of the plaintiff. As a result of the injunctional order, the funds of the village of Wyndmere accumulated in its treasury, and, nearly a year thereafter, the warrants remaining unpaid, the village having employed counsel in

21 N. D.—25.

behalf of itself, trustees, and the defendant treasurer, a supplemental
complaint was served, reciting the reason therefor to be that of an
agreement between the counsel for plaintiff and defendants, which sup-
plemental complaint was entitled against W. D. Springer as treasurer
of the village of Wyndmere and its trustees, naming them, and the
North Dakota Artesian Well Company, a corporation, all named as
defendants; and which complaint changed the entire nature of the
action from one in equity to one at law. This supplemental complaint
recited the ownership of the warrants as in the plaintiffs; that the
same had been presented for payment long prior thereto, and were
wholly unpaid; that funds had accumulated in the treasury of the
village of Wyndmere amply sufficient to pay the same in full; that the
plaintiffs were informed that the village had a defense to the payment
of said warrants, and claimed the invalidity of the same. It further
alleged that the warrants were indorsed to plaintiffs by the North
Dakota Artesian Well Company, defendant, and that the plaintiffs
purchased the warrants from said company for a valuable considera-
tion, and that said company at the time of the purchase thereof by
plaintiffs guaranteed said warrants were in all things genuine and
the enforceable obligations of the village of Wyndmere, and that there
existed no set-off, counterclaim, or legal defense against said warrants,
or either of them, on the part of said village. But that said village
claimed a set-off or counterclaim against the warrants to the full
amount of the same. The supplemental complaint further recited that
the defendants, village of Wyndmere and its trustees, and the North
Dakota Artesian Well Company, for the purpose of avoiding further
litigation and to the end that the rights of all the parties might be
determined and adjudicated in this action, were willing to be joined
as parties defendant, to litigate herein their respective rights, and that
the plaintiff was willing they should be so joined and so litigate fully
the matter on the merits by this one action. And judgment was asked
for against the village of Wyndmere and the North Dakota Artesian
Well Company for the amount of said warrants with interest thereon;
and that the treasurer of the village of Wyndmere be ordered and di-
rected to pay the said judgment from the funds in his hands, against
which said warrants were drawn.

To this supplemental complaint the defendant village, its treasurer,
and trustees answered, accepting and admitting service of said sup-

plemental complaint, and in its behalf set forth in detail its defenses to the payment of said warrants. This was substantially to the following effect: That the village of Wyndmere was not indebted to the defendant well company or the plaintiffs in any sum whatever; further that on December 8, 1905, said well company entered into a written contract with defendant village to dig, drill, sink, and construct for the village an artesian well, for the consideration and upon the terms and conditions as set forth in a contract, the portions material to this inquiry being:

"This agreement made and entered into this 8th day of November, A. D. 1905, by and between the North Dakota Artesian Well Company, a corporation of the state of North Dakota, located at Oakes, North Dakota, party of the first part, and the village of Wyndmere, North Dakota, party of the second part:

Witnesseth, That the party of the first part agrees and contracts with the said party of the second part, as follows:

First. On or about November 18th, 1905, to commence work on an artesian well to be located on village property in Block 7 in said village of Wyndmere, said land being the property of the party of the second part, and to prosecute the work thereon continuously and without unnecessary delay until said work is finished.

Second. To drill said well to a depth necessary to obtain a flow of water sufficiently clear for domestic and stock purposes. Striking quartzite or granite shall be considered proof of sufficient depth to fill this contract.

Sixth. For and in consideration for the drilling and casing of said well, said party of the second part agrees to pay the party of the first party the sum of $1.50 per foot for entire depth of well, to be paid in cash at completion of well. . . .

Eighth. Party of the first part guarantees the well not to choke or clog for a period of one year from date of completion, but only on condition that the well is not used for power purposes, and that the flow of water from well is not checked by valves or mechanical contrivances, except upon permission of the party of the first part. In case the well should stop before that time, party of the first part will repair same or drill a new well, free of expense to the party of the second part. This guaranty, however, is null and void unless the well is settled for according to this contract."

The village, by way of answer, also alleged that the said company had failed, neglected, and refused to dig, drill, or construct an artesian well within the terms and conditions set forth within the written contract, in that said company neglected to drill said well to a depth necessary to obtain a flow of water sufficient for domestic and stock purposes, and that said company has never drilled or constructed any well for said village from which water sufficiently clear for domestic and stock purposes was obtained, but that the flow from the well constructed under the foregoing contract was at all times dirty and full of impurities, and at all times wholly unfit for domestic or stock use; and that said well was settled for by the village of Wyndmere in compliance with the terms of said contract, in anticipation that the well company would thereafter comply with the terms of its contract by digging for the village an artesian well furnishing a flow of water sufficiently clear for domestic and stock purposes. Said answer of the village and officers further alleges that on the failure of the well dug, for which the warrants were given, the well company, on February 4, 1907, entered into a further written contract as follows, to wit:

"This agreement, made and entered into this 4th day of February, 1907, by and between the North Dakota Artesian Well Company, a domestic corporation, party of the first part, and the village of Wyndmere, North Dakota, party of the second part,

Witnesseth: That the said party of the first part agrees and contracts with the said party of the second part as follows:

First. That the party of the first part is to abandon work on the old well and commence work on a new well to be located on corner of Fifth and Ash streets, as party of the second part may designate.

Second. Party of the first part is to have the privilege to pull all pipes and casings out of the old well, and use same in the construction of the new well.

Third. Party of the first part is to drill said new well to the same flow as the old was finished, or 523 feet deep, which is to the same depth that old well was finished at, and to pipe same with 3 inch std. blk. pipe.

Fifth. That party of the first part agrees to use all due care and diligence to secure clean water.

Sixth. In consideration of the drilling of this well, party of the second part agrees to pay the party of the first part the sum of $150,

and to release party of the first part from all obligation and liabilities in the old contract of date of November 8, 1905, and which is hereto attached and marked Ex., and made a part of this contract."

The answer then alleges that under said second contract, defendant company sunk and drilled a well to a depth not exceeding 225 feet, and failed to properly construct the well, and failed to obtain water sufficiently clear or in any way suitable for domestic or stock purposes, or to furnish any water whatever, and that defendant well company refuses to dig and procure for the village an artesian well as contemplated in their contract, which are the two contracts above set forth; that the well dug has always been of no value; that a well as contracted for would have been worth to the village $784.50, the contract price to be paid therefor; accordingly defendant village and its officers demanded the dismissal of the action. This answer was served upon the plaintiffs, and service thereof accepted and admitted by them, as well as by the defendant Artesian Well Company, who by its attorney answered alleging the contracts and performance under them; the digging of the well; that the same was as contracted for; that the well was accepted by the village, and paid for by the payment to the well company of cash in the sum of $784.50. That said cash was obtained of the plaintiffs under previous arrangement of the village with the plaintiffs, in which the warrants should be drawn and issued to defendant well company, and by them transferred as an accommodation indorser only to the plaintiffs; that no consideration was paid for such indorsement, and that the delivery and indorsement merely constituted an accommodation transaction, whereby the village delivered its warrants into the hands of the plaintiff, and from plaintiff procured the cash to pay the well company for the well dug by it for the village. The well company, further answering, denied that they guaranteed that the warrants sued on were genuine, valid, and enforceable obligations of the village, and denied that there was any legal defense, set-off, or counterclaim to the warrants on the part of the village. Further answering, the defendant, in answer to the contention of the village of Wyndmere, defendant, denied the answer of the village, except admitting its contracts hereinbefore set out with said village, and alleging its full performance thereunder. It further alleges that what it did under the second contract was an independent transaction, and in no wise revoked, set aside, or opened the settlement made for the con-

struction of the well under the first contract, but that, as an accommodation to the village, the defendant well company deepened the first well about 100 feet, and, being unable to make it satisfactory, dug a new well under a second agreement, and that the well so last constructed was dug in accordance with the contract, and completed February 13, 1907; and that, because thereof, the village of Wyndmere became indebted on the second contract to the defendant well company in the sum of $150; that demand has been made therefor, and payment refused. And judgment was demanded that plaintiff have and recover nothing of it, and that said company recover from the plaintiff for its costs and disbursements; and that it recover of the village of Wyndmere the sum of $150 and interest.

To the answer of the village, the plaintiff replied denying generally the answer, except admitting the execution and delivery of the contracts, and alleging the compliance therewith by the well company defendant, and the acceptance of the well by the village of Wyndmere. Also, they admit, by way of reply, the execution of the second contract, and allege that the well company defendant has fully performed thereunder, and that the village of Wyndmere and officers ought to be estopped to say that the village of Wyndmere has suffered any damage in relation thereto; and further allege the insolvency of the defendant well company, and pray for damages as demanded in their supplemental complaint. To the answer of the defendant well company interposed to the supplemental complaint, the defendants, village of Wyndmere and officers, served and filed a general denial to all matters contained in the answer and counterclaim, except those matters admitted or alleged in the answer of said village and its officers hereinbefore set forth.

The foregoing recites in substance the pleadings in the three-cornered action in which issue was joined prior to the case being called for trial on the regular December, 1910, term of district court for Richland county. When so reached and called for trial, counsel, on behalf of defendant village, treasurer, and trustees, announced the case as triable to a jury. Counsel for the plaintiffs and counsel for defendant well company joined in a demand that the action be tried by the court without a jury, providing that the court, if it so desired, might submit any fact or facts involved to a jury at the convenience of the court, and, accordingly, moved that the action be tried by the

court as an equity case; which motion was by the court denied, to which ruling both counsel for plaintiffs and company excepted.

A jury was called and trial had on the merits, plaintiffs offering their testimony, and establishing a prima facie case, and resting. The defendants village and its officers offered testimony at length, including the two contracts heretofore set forth. That, under the provisions of the first contract between the well company and the village, the well company, prior to December 16, 1905, dug an artesian well in said village, and secured a flow of water a short time prior to December 16, 1905, but that the water remained roily and full of impurities, and never ran clear, pure water or water suitable for domestic or stock purposes. The village, relying upon the representations of the officers of the well company, and particularly on the second and eighth paragraphs of the first contract, and because of the conditions of said contract reciting that payment for the well was to be made in advance of the expiration of the period for which the same was warranted, paid for the well by the execution and delivery by the village board of the two warrants sued on, which were, on December 16, 1905, executed by the village officers payable to the defendant well company as payees, and were by said company indorsed and negotiated immediately upon their receipt over to the plaintiffs, Hart and Springer, who gave the well company cash to the amount of the warrants.

Such testimony shows that the well was never satisfactory, and never furnished suitable water; that on the March following, the managing officer of the defendant well company put a lock and key on the well to regulate the flow of water to clear the water, without results; that thereafter the flow became clogged; about six months after the warrants had been issued in payment for it, the well stopped flowing altogether. The village repeatedly demanded of the well company that the contract under which the same was dug be complied with, by the repairing of the old well or by the digging of a new one, and finally about the first of February, 1907, seven months after the commencement of this action, and while the payment of the warrants was tied up by the injunctional order originally issued therein, the defendant well company attempted to repair the well, digging it deeper, but soon abandoned work thereon. They and the village then executed Exhibit "C," and thereunder left the first well and dug the second one, to a depth of 315 feet, under the testimony offered by the village, striking

a flow of water on February 15, 1907. The water remained roily, carrying quantities of sand, until the night of February 18th, when it ceased running because of the sand clogging it completely, of which stoppage defendant well company was notified by letter by the chairman of the board of trustees on February 21st following; that the second well was, on February 15th, cased with the casing pulled out of the first well; that thereafter the vice president of the company, who, on behalf of the company, executed both contracts, met with the board of trustees, where he demanded $150 under the second contract, offering to clean out the well with a force pump he had with him for that purpose, if the board would pay him said sum in advance, which proposition was refused by the board, and thereupon defendant well company abandoned all attempts to further perform under either or both the contracts.

At the close of the foregoing testimony of defendant, the defendant village having rested, the defendant well company moved for an instructed verdict in their favor, and against the village, for the sum of $150 and interest from the 15th of February, 1907, and also moved that a verdict be returned in their favor, and against plaintiffs, on the ground that they had performed fully under their contracts, and that no failure of consideration for the warrants in the hands of the plaintiffs had been established, and that they were not liable as indorsers, or guarantors of the warrants, which motion was denied.

Thereupon defendant well company offered its proof, admitting digging of the well under the first contract executed by it and village, and offering evidence to show that they had refused to dig the well, except that they would be paid in cash; and that the execution and delivery of the warrants to their vice president, and the indorsement by him to the plaintiffs, were but part of an understanding had between them and the village officers and the plaintiffs, whereby defendant company would receive cash instead of warrants, under the cash provision in the first contract. That the flow of the well was about 23 gallons per minute; the water cleared after two days, and the water, ten days from the completion of the well, was, to quote its witness, "what is considered and generally accepted as water sufficiently clear for domestic and stock purposes; that the water was at the time he left it after the completion of the well, and at the time he returned thereto about ten days later, suitable for domestic and stock purposes." That on December

16, 1905, the day the contract was settled for by the village, the volume of water was the same, and the water was suitable for domestic and stock purposes. That about twenty-four days after the well was completed, the well was flowing roily, and it was by the company suggested that the flow be reduced by putting a valve on the well; this was done, and the key turned over to the town marshal, and the flow of the well closed to about 8 gallons per minute. The next December the company's vice president met with the board, when it demanded the company should drill the well deeper. He told them that he considered the old contract fulfilled, and that they were under no obligations to come back under it, but that, if they would pay $1.50 per foot, the company would drill the well deeper; which proposition was acceptable to the board, "and it was in pursuance of that conversation and proposition, and their acceptance of it and what followed therefrom, that the second contract was made and entered into. Under this contract the pipe was taken from the old well, and moved to where the new well was located, and a well drilled to a depth of 522 feet, and piped with the pipe from the old well, and a flow of about 12 gallons per minute, was struck. Prior to entering upon the construction of this new well, and under this verbal agreement with the board of trustees of the village for sinking the old well to a second or clearer flow, the company drilled the old well from a depth of 522 feet to 615 feet."

Defendant's witness further testified the flow of the second well was about 12 gallons per minute and clear; that he saw it for three days thereafter, and it was then flowing clear water; that during the first of March, 1907, he presented a bill to the village for the $150 due the company under the contract, stating that he considered the contract complete, and that if they would accept it as such, he would do what he could to restore the flow to the well, which had previous to that time clogged; that in his opinion the sand coming with the water in the pipes had caused the stoppage of the flow of water. That in the opinion of the witness the well did not start flowing roily and sandy on account of any imperfection in the drilling or finishing of it.

The defendant company renewed its motion made at the close of the case of the defendant village, which motion was denied. Thereupon demand was made by the plaintiffs that the court require the jury to find a special verdict, which demand was granted. Thereupon a special verdict consisting of forty-six questions was prepared. The

court prior to the submission of the verdict to the jury, on motion of the respective counsel, answered the greater portion of said questions, and the remaining questions were answered by the jury; but the entire verdict, including the questions answered by the court, and the questions unanswered, was taken by the jury upon their retirement. The record shows the following stipulations entered into just prior to the submission of the matter embraced in the special verdict to the jury, to wit: "It is stipulated in open court by and between the parties to this action, that the questions submitted by the court to the jury in the form of a special verdict covered and included all the issues of fact involved in this action." That the verdict returned by the jury consisted of answers to the questions submitted to them, which verdict was unsigned, but was by the court received as such verdict. No objection was made to the verdict being unsigned until long after the jury were discharged, and motion was made for judgment on the verdict. Thereafter, on the verdict, judgment was entered in favor of plaintiff against the defendant company, for the amount of the warrants with 7 per cent interest to date of judgment, and judgment was also entered in favor of defendants village and its officers, that they recover their costs against said plaintiffs, Hart and Springer; and also that the counterclaim of the well company against the village and its officers be dismissed. Thereafter, and within time, an appeal was duly perfected to this court from the judgment in favor of the plaintiff against said well company, by the service of appeal papers upon the plaintiffs and the defendants village of Wyndmere, its treasurer, and trustees.

The appellant now urges for the review of this court as error the rulings of the trial court, and particularly the action of the court, (1) in trying the case before a jury, over appellant's objection; that the same was a court case properly triable to the court alone, and not a jury case, and (2) that the court was without jurisdiction, contending that jurisdiction cannot be conferred by consent of parties, and could only be acquired under process or by order of court made in pursuance of the provisions of statute as to the bringing in of parties as litigants in the case; and (3) errors of law arising during the trial upon the admission of testimony; and (4) refusal of the court to grant the motions of appellant for a directed verdict; and (5) alleged insufficiency of the unsigned special verdict to support a judgment.

This action was, as begun, purely an equitable action,—no money judgment was asked and nothing sought but an accumulation of village funds. So, the order against the village treasurer, sole defendant, accomplished all that could be done by the action. After the fund was so accumulated, the village and well company voluntarily interpleaded in the action, by agreement with plaintiff and defendant to avoid the evident necessity of beginning two separate actions at law, to determine the rights of all concerned. The case as begun was then changed radically by the appearance of other and additional parties to the action, interpleading without formal order of court so directing. The parties stipulated their issues, accepted service of their pleadings for the express purpose, as appears therefrom, of determining in this one action all the issues involved. These matters for determination were the liability of the village on the original contracts upon which any obligations to pay the warrants in suit must arise, and upon which contracts any counterclaim against the payment of such warrants must be based. Then again, if the village warrants were subject to offset by damages suffered by the village, what was the liability of the defendant company because of its indorsing and negotiating said warrants to the plaintiffs? The determination of these two main questions decides the case. If the village is under no obligation to pay the warrants, because of its release from liability through a valid counterclaim arising out of the transaction under which they were issued, then such negotiation and indorsement of the warrants cannot exempt them from the effect of such counterclaim, they being non-negotiable within the meaning of the law merchant in such respect, and any defense against their payment can be asserted, no matter in whose hands said warrants happened to be.

The issues as between the village and the well company, so far as this action is concerned, are the same as though the well company had sued the village for payment for the construction by it of the well for the village. In fact, under the counterclaim of the company for $150, such is the issue tendered. Such a suit is one at law and a matter properly triable to a jury; in no sense can it be considered an equitable action. Then again, this action, as between the plaintiffs who hold the village warrants, and the well company, who negotiated the same to them in the first instance, amounts to no issue at all, if the well company recovers judgment in its favor against the village on its

counterclaim, as such a recovery would be tantamount to a finding that the village had no valid counterclaim against the payment of the warrants, and that the village was liable for the warrants outstanding as well as for the $150 counterclaim. Conversely, should the village recover by a finding of fact to the effect that the warrants were paid by its counterclaim for damages, such would in effect be the equivalent of finding said warrants were without consideration and void. Then the suit as between the plaintiffs and the defendant well company would be the same as between the ordinary purchaser and seller of non-negotiable instruments, which after negotiation proved to be worthless. The determination of these issues between the parties would be strictly a law action involving no equitable principles or equitable relief; it would be the equivalent of a joinder of two suits at law for damages. In other words, had the village and the well company litigated the validity of the warrants in an action brought by the village against the well company for damages, in which the village recovered, and in which action the invalidity of the warrants as between those parties was established, this action, as between the plaintiffs and the well company, involves issues the same as though thereafter the plaintiffs had sued the well company as the seller to them of non-negotiable, invalid warrants. Such an action would certainly have been one triable to a jury on all questions of fact involved. Then again, this action stands as between the plaintiff and the defendant village with no issue involved other than what would be fully determined by the adjudication of the rights of the parties in the above matters; the questions involved being merely the validity of the contracts between the village and the well company, and manner of performance under them, and the liability of the well company to the plaintiffs for the warrants sold and indorsed to them. The pleadings, by attempting to plead an estoppel in one instance, do not change the issues involved or their determination. No sufficient facts are pleaded upon which an estoppel can be predicated, and the pleadings are to that extent merely surplusage. Nor is the action one in which, from the nature of things, an estoppel can arise. If there be a defense available to any of the parties litigant, it is a defense given by law because of counterclaim virtually amounting to a failure of consideration, because of failure of performance under the contract, or a right accruing because of a sale of worthless securities, or a defense in law to such a claim. Indeed, in these par-

ticulars the evidence shows that all the parties had equal knowledge of all matters of fact involved, and all of them dealt with their eyes open, and charged with knowledge of the law. There is an entire absence of fraud or any evidence from which it could be implied. Consequently, the case resolves into an adjustment of the rights of the parties under legal as distinguished from equitable principles. There is nothing upon which an estoppel can be predicated in favor of any of the parties or against any of them, nor is there any groundwork for an estoppel.

For the foregoing reasons, the case and all the issues involved in its determination were properly triable to a jury. Of course, the issues were somewhat involved, as must necessarily be in every action in which three parties attempt to try two different lawsuits in one action. But the parties chose to do so, and because they so elected and so act does not in itself change the nature of the action from one in law to one in equity.

No relief was available to any of the parties except for money judgment, nor was any issue involved except that of an issue of fact for the recovery of money only, and under § 7009 of the Code, such issues must be tried to a jury unless a jury is waived. The court, therefore, was obliged, on the demand of one of the parties, to submit the issues to a jury for their determination.

This brings us to a discussion of the question of jurisdiction raised by the defendant company's claim that the trial court was without jurisdiction over it as a defendant, or of the subject-matter litigated by it in the action. Want of jurisdiction over the person or subject-matter can be urged at any stage of the proceedings; but it is significant that want of jurisdiction was not raised until after the entire trial of the action on the merits, and a determination therein adverse to the appellant had been rendered. Had appellant recovered in the trial court, it would now be strenuously contending for the jurisdiction of that court and the validity of the judgment, were it before this court on its (codefendant's) appeal. This action was begun in the district court by the plaintiffs against the treasurer of the village of Wyndmere. A summons and complaint were regularly issued and served with an order of court based thereon. The court then had by regular process jurisdiction of the parties and subject-matter. Thereafter, by stipulation of the parties recited in the pleadings themselves, addi-

tional defendants were named, among them this appellant company,. and the supplemental complaint was drawn to state a cause of action. against such company so named as an additional defendant, service of' which complaint was accepted and admitted by the attorney for the. defendant now urging before this court a want of jurisdiction.   Such defendant, in an answer in which it was named as a defendant, an-- swered as such not only the complaint of the plaintiffs, but the plead- ing of their codefendant village and its officers, thereby bringing such corporation and its matters subject to litigation involved in the trans-- actions in controversy, into the suit voluntarily, and submitting the· same along with jurisdiction over it to the court for determination by trial, in order, as the record shows, that all matters in issue might, be determined in the one action.   To the answer of the defendant com-- pany replies were interposed, served, and service accepted.   The en- tire cause was brought upon the trial calendar of said court either by· notice of trial served or by stipulation of the parties, as the cause was: placed on the court calendar, and that the same was regularly thereon is presumed in the absence of objection.   Then the case was moved for· trial by the plaintiffs, with appellant joining in said motion and de-- manding trial by the court.   Defendant participated throughout the· trial, offering evidence, cross-examining witnesses, putting in its case,. moving for a judgment, requesting instructions, joining in preparing: a· special verdict, even stipulating in open court that the special ver-- dict covered and included all issues of fact involved in this action.. After so fully and freely litigating its rights on the merits, and hav-- ing its day in court, it, for the first time, challenges the jurisdiction. of the trial court.   Appellant's contention in this respect is unsound, and cannot be upheld.   To hold otherwise would be to make a farce of' court procedure.   Defendant elected to litigate his case with the parties, in the manner and form as above, and he is bound by the results, and cannot now be heard to complain because of an adverse decision.   If' cases are needed to support the holding of this court on the above prop-- osition, see Boyd v. Wallace, 10 N. D. 78, 84 N. W. 760, to the ef-- fect that "one who is not a party defendant on the record in an action,. but who participates in the defense, and has an interest in the matter· in controversy in the action, and participates in the defense for the· protection of such interest, and not as representing the interest of the· defendant of record, and where it is known to the plaintiff that such.

party so participates for the protection of his own interest, is bound by the decree rendered in the action." At the conclusion of the opinion, after reciting the above circumstances, the court uses the following language: "That he is bound by the decree under such circumstances has been too often decided to require further discussion." This is the opinion of our own court in a case where the party was bound, although not named in the pleadings as a party to the action. Certainly a party who is named as a party litigant, pleads, defends and submits his cause for arbitrament, would be concluded by the judgment so procured, because of his voluntary acts in invoking jurisdiction and procuring the rendition of the judgment. See also Anglo-American Packing & Provision Co. v. Turner Casing Co. 34 Kan. 340, 8 Pac. 403; Blades v. Des Moines City R. Co. 146 Iowa, 580, 123 N. W. 1057; Ramsdell v. Duxberry, 14 S. D. 222, 85 N. W. 221, s. c. in 17 S. D. 311, 96 N. W. 132; Haggarty v. Strong, 10 S. D. 585, 74 N. W. 1037; 3 Cyc. Law & Proc. pp. 515, 516, and notes.

Another contention of the defendant company urged is that the warrants upon which judgment was rendered against said company on its implied warranty to plaintiffs, that the warrants were valid and legal obligations of the village, and not subject to set-off or counter-claim, were merely transferred by it to the plaintiffs as a mere conduit of title in which it was in the position of an accommodation indorser only, transferring the warrants to the plaintiff under a pre-arrangement with the village officers and the plaintiffs themselves, trustees of the village, and that all this was done in order that the village might comply with its contract, wherein it agreed that the consideration for the drilling and casing of the well to be paid by the village was "to be paid *in cash* at the completion of the well."

As to this contention, defendant company, at the time of the execution of the contract calling for payment to be made in cash at the completion of the well, being bound to know the law, thereby knew that the contract called for the performance of a legal impossibility on the part of the village. If the contract was to be construed literally to the effect that cash, instead of village warrants or orders for payment of money, was to be the payment for said well at its completion, the defendant company is presumed to have known that the provisions so imputed would call for an *ultra vires* act on the part of the corporation. Defendant company, like all persons dealing with a municipal

corporation, is bound to know the extent of its powers, and cannot hold it liable for a false representation by its officers concerning matters not within its powers, or for the breach of contract that they have no authority to make on its behalf. Sandeen v. Ramsey County, 109 Minn. 505, 124 N. W. 243, and cases cited. Therefore, under defendant company's contention giving its chosen construction to the transaction, the village could in no wise be bound, nor could its officers as officers of the village. No legal payment could be made to defendant for the well, by the village or its officers as such, without the issuance and delivery of the warrants or orders of the village on its treasury for the money. And the execution and delivery of such warrants by its officers in its behalf to the defendant company was in law the payment in the only manner allowed by law of any obligations of the village to the defendant company. The warrants so delivered were cash or legal tender payment in contemplation of law; though said warrants were actually worth but a part of their face in law, they were payment at face value. The village, in delivering its warrant to the defendant, could not pay its obligations as it did without conferring the absolute title and ownership in defendant company to the warrant so given in payment. The defendant company then in no way could secure the benefit of the warrants without becoming the actual owner of them, and as such actual owner it had to part with title to the warrant in any transfer of the same to the plaintiff or any other person. It could do so in no way except by a sale and delivery thereof, which it accomplished by indorsing the same to the plaintiffs, receiving from the plaintiffs therefor in cash the face value of the warrants. The law can recognize no other way, nor is there any other manner, in which title to the warrants could have been transferred regularly from the village that issued them to the third party plaintiffs, except in this manner. Nor could the defendant company in negotiating said warrants in any way, except by express contract to that effect, escape the warranty implied by law from such transaction, wherein the rule of law resulting from the act of the defendant company in such transfer made such company a guarantor to plaintiffs that the securities so transferred were not spurious, false, or counterfeit, but, on the contrary, were genuine, unpaid, and not subject to offset or counterclaim. See Giblin v. North Wisconsin Lumber Co., 131 Wis. 261, 120 Am. St. Rep. 1040, 111 N. W. 499; Scott v. Hix,

62 Am. Dec. 458, and note (2 Sneed, 192); French v. Turner, 15 Ind. 59; Delaware Bank v. Jarvis, 20 N. Y. 226; Keller v. Hicks, 22 Cal. 457, 83 Am. Dec. 78, and many cases cited in these leading authorities. The defendant company therefore, on the contention urged, could not escape liability to the plaintiffs resulting from the sale by it of the village warrants, when the village had a valid counterclaim to the amount of the warrants against their payment at the time of their negotiation, as was found by the jury and disclosed by the incontrovertible evidence on the trial of the case.

The village offered proof establishing that the first well dug had failed, and that, under the second and eighth paragraphs of the contract under which said well was drilled, the defendant company was liable on the village's demand for breach of the written warranty that the well would not choke or clog for a period of one year from the date of completion, and that, if the well should stop flowing before that time, the well company would repair the same or drill a new well free of expense to the party of the second part, and furthermore that the well was not according to contract, in that the water was never sufficiently clear for domestic or stock purposes. The defendant company in its main case, by the testimony of its vice president, its managing officer, and the officer who, on behalf of said company, had negotiated all the contracts and performed all the transactions had with the village, established by his testimony that, on the village's demand that the well be repaired or a new well dug, his company, acting by himself, drilled the first well deeper in an attempt to repair the same. That he met with the board, and in further compliance with the first contract, under which the obligation arose to repair the well or dig a new one free of expense, entered into the second written contract with the village. This contract was executed by the village board in session for the purpose, and by the defendant company by its vice president, and under the second contract the second well was begun, and the second contract attempted to be complied with. Then the defendant well company sought to establish that the first written contract had been abrogated by a verbal intervening contract consisting of statements made by him to some members of the board at or during the time the well company, acting by the vice president, was deepening the first well in an attempt to repair the same, the claim being made by the defendant company that this statement by him to some

21 N. D.—26.

members of the village board, acted upon by the well company in do-
ing the attempted repair, vitiated the old contract by the establish-
ing of a new one.  And defendant company further contends in this
connection, that this verbal contract was in turn abrogated by the sec-
ond written contract.  In other words, the defendant well company
attempts to escape its liability on the first contract, wherein it agreed
to repair the old well or drill a new one free of expense to the village,
by asserting some understanding between it and some member or mem-
brs of the board of trustees of the village, whereby the obligations to
perform under the written contract were turned into a consideration
for a new verbal agreement with the village exonerating the company
from further compliance with its written contract, and creating a lia-
bility of the village to the company, and that, because of this verbal,
indefinite contract, the second written contract resulted; so that said
second written contract was in no wise connected with or dependent
upon, or to be construed with or as a part of, the first written contract;
to the end that an attempt at performance, as was done by the well
company under the second written contract, could be construed by it
as a performance thereunder, exonerating it from the written guaranty
made by it in the first contract, under which it was obliged to dig a
new well or risk the liability of having a counterclaim interposed
against the payment of the warrants, thereby totally defeating them,
and leaving a resulting liability from the well company to the hold-
ers of the warrants.  It was in defendant's ingenious attempt to thus
avoid liability on its original contract that it sought to offer evidence
as to what was discovered on deepening of the first well, and what con-
versation was had with the village officers in reference to the same,
and which offer of testimony was, on objection suitably made, prop-
erly excluded.  This is the only error alleged as occurring in the ad-
mission of testimony in the whole case, and this fact alone is enough
from which to infer that the issues were not so involved, but that full
proof was allowed and offered concerning all claims of the defendant
well company in litigation, and that in fact all parties had their day
in court whether the action be regarded as one in equity or a suit at
law. .

A construction of the contracts shews the testimony offered was
without the case and wholly immaterial; the obligation to dig the
second well arose under the contract under which the first well was dug.

The reaosn for the execution of the second contract was the condition in the first one. The second contract expressly provided for abandonment of work on the first well, and that the pipes and casings therein should be used on the second; and the company agreed to use due care and diligence to secure clear water, and was to drill to the agreed depth of the old well, or 523 feet, and receive therefor $150. The object of the second contract was to leave the situation so beautifuly indefinite that the defendant well company, in case it got no water, or bored but a worthless hole in the ground, could construe the same as a compliance with the first contract, wherein it had agreed to dig a well, and for which it had already more than a year before received full payment, and rendered nothing in return. In addition, the well company was to get $150 of the village for doing what it was already obligated by written contract to do, and also be released "from all obligations and liabilities in the old contract," under which the first well was dug. The written contracts themselves, and the attempted performance under them, render immaterial any oral negotiations pending between the two parties prior to the execution of the second written contract. If the second contract meant anything, it was that it should supplement the first contract, and supersede any oral bickerings between the parties. Had a satisfactory well been dug under the second contract, appellant would have insisted rightfully on his recovery of $150, regardless of any oral negotiations leading up to it merged therein. The contract operates to the same effect against the defendant company's contention, and excludes every possibility of the testimony offered being properly admissible. Besides, work on the old well was abandoned, and a new well dug under the new agreement. Why the old well was abandoned is immaterial. The parties abandoned it by written agreement, and thereby rendered the reasons therefore wholly immaterial.

This takes us to the questions raised by appellant regarding the special verdict. Under the stipulation between the parties, the questions submitted to the jury under the special verdict covered and included all the issues of fact in the action, and the sufficiency of the verdict as a special verdict was by stipulation waived. The intent of the parties could have been none other than just what is covered in this stipulation. It is noticeable also that, at the time this stipulation was entered into, the court had answered on motion of some of the parties litigant, and over the exception of others, appellant participating there-

in, twenty-seven out of forty-six of the questions, and was about to submit the remaining questions to the jury. The effect of the stipulation was that the court was authorized to supplement such findings by considering therewith any undisputed facts pleaded or admitted as might be necessary, upon which to base judgment.

Nor was it necessary under the evidence at the close of the trial that the court submit many of said questions to the jury for their determination. A careful inspection of the record convinces us that there was no material controverted issue of fact at the close of the case, and that the court could have itself properly answered every question necessary upon which to base the identical judgment entered, or could have directed the jury to have so answered all questions necessarily involved in the determination of the case. In proof of this, we will briefly review the questions submitted by the court to the jury and answered by them.

The first question they were allowed to answer was in substance whether the village executed the warrants sued upon on the date they bore, December 16, 1905. The jury answered this in the affirmative. Defendant company's answer in the fourth paragraph thereof admits the issuance of the warrants, their registration and indorsement, and the receipt therefor of their full face value. No issue was tendered on the pleadings on this question. Question number eight was next submitted to the jury, and answered in the affirmative; the question being whether the defendant company delivered said warrants to the plaintiffs, Hart and Springer, on December 16, 1905. This is admitted by defendant company's pleadings. No issue is tendered on this question. The next question submitted was number sixteen, an inquiry whether the well company, at the time the warrants were executed and delivered, had drilled a well for the defendant village to a depth necessary to obtain a flow of water sufficiently clear for domestic and stock purposes, which was answered by the jury in the negative, the answer to which is purely speculative. No such well was dug, if no water sufficiently clear for stock and domestic purposes was obtained, and as to whether it could be obtained at that place is therefore purely speculative so far as the depth necessary to obtain such a flow of water is concerned. The answer to the question is rendered immaterial by question seventeen, an inquiry as to whether the well drilled under the first contract discharged water sufficiently clear for

domestic and stock purposes at any time; which was answered by the jury in the negative. This answer involved a substantial conflict in the testimony; the village offered testimony of witnesses who had observed the well from the time it began until it ceased flowing, and their testimony describes the flow in particular as to the sand and impurities flowing from the well; and all agree that the water was at all times in fact not proper water for domestic or stock use because thereof. That the uncontradicted testimony shows that, at the time the warrants in issue were being delivered in payment for the well, said well was not satisfactory, in that the water was not sufficiently clear for domestic or stock use, and that at the time of the delivery of said warrants, when the board met to issue them, the vice president of defendant company was told by witness Springer, one of the aldermen at that time, that the water was not clear, Williamson replying that "you have a contract which binds us for a year;" and witness stating to Williamson, "No, that contract isn't fulfilled yet; that contract runs a year, and I understand if we pay this it will make that contract null and void;" Williamson replying, "No, that contract is good for a year." And under such representations, notwithstanding the well was not running water sufficiently clear for domestic or stock purposes, the warrants were delivered in payment of it. Williamson, in defendant company's case, testified that he obtained water from this well such as was generally accepted as water sufficiently clear generally for domestic and stock purposes, and thus describes the condition of the water at the time referred to, but admits that twenty-five days after the completion of the well, and after such time, the flow of water was roily, and, because of it, he reduced the flow from 23 gallons per minute to 8 gallons per minute, hoping that this would clear the well, which the undisputed testimony shows it did not do, and that the well afterwards plugged up on account of the sand carried by the water from the bottom of the well into the pipe. In the light of the foregoing testimony on the subject, and the conduct of the well company in abandoning this well, admittedly because it could not be made satisfactory under the contract under which it was dug, the court could properly have instructed the answer to questions sixteen and seventeen as found by the jury, after which the answer to question nineteen became immaterial. If this answer was erroneously found by the jury, or if the court had answered it in the

affirmative, it could not have changed the result or altered the company's liability to the village under the eighth paragraph of the contract, especially so when the company acknowledged their liability under the second contract and an attempted 'performance thereunder. The court could, under the uncontroverted evidence, properly have answered question twenty-one, as the jury did, in the negative; said inquiry being as to whether the village of Wyndmere at the time of the issuance of the warrants accepted the well as in all respects complying with the terms and conditions of the contract under which it was constructed. The undisputed testimony shows that it was not so accepted. Question number twenty-two, submitted and answered in the negative, was an inquiry as to whether the well was ever delivered to the possession and control of the defendant village. And question number twenty-four, as to whether the village ever took possession, and assumed and exercised control over the first well, which question was answered by the jury in the negative. Both these questions are, under the evidence, immaterial, and the judgment entered could properly be entered without answers to the questions, or with them answered the opposite way to that answered by the jury. Question number twenty-six was an inquiry as to what the first well dug was worth, to which inquiry the jury answered nothing, and regarding which there is no conflict in the testimony any more than there was as to what the village paid for the digging of the well. Question number thirty of the verdict is an inquiry as to whether the defendant well company, under the second contract, dug a well to the depth of 523 feet, to which the jury answered, "No." There is a conflict in the testimony in this particular. The testimony of the village trustees, who measured, shows 315 feet to be the depth, while Williamson's testimony was to the effect that the well was 522 feet deep, so, under Williamson's testimony, the well was not dug to the depth of the former well, and the jury could not have answered the question under the testimony any other way than in the negative. Question number thirty-one was an inquiry as to whether the defendant company used all due care and diligence to secure a flow of clear water from the second well constructed, which was answered by the jury in the negative. Under Williamson's testimony of refusal to use apparatus had with him shortly after ceasing work on the well, which apparatus he states was for the purpose of removing the sand

from the well to allow it to flow, it having previously clogged, and he testifying that he refused the request of the village to do anything more towards making a well of it until he received the contract consideration of $150, the court could with reason and within the evidence have answered this question as the jury answered it, in the negative. And what is true as to question number thirty-one is true as to question number forty-six, an inquiry whether the defendant dug the second well in such manner as to secure the village a supply of clear water, to which the jury answered, "No." The judgment in no wise depends on the answer, whether yes or no, and it is therefore immaterial. Question number forty-one is an inquiry whether the defendant company dug the second well to a depth of 522 feet, which was answered by the jury in the negative, the answer to which question involves a conflict in testimony as heretofore stated; the jury finding against the well company. Question number forty-two was an inquiry as to whether the second well ever produced a flow of water sufficiently clear for domestic or stock purposes, which question was answered in the negative, and over which point there was no conflict in the testimony whatever, the well having run sand for three days and then plugged up entirely. Question number forty-five was an inquiry as to whether the second well was completed by the defendant company on the 15th day of February, 1907, which was answered in the negative; the jury evidently finding that the well, as a well, was never completed. The other questions answered by the jury relate to the warrants, and are as follows: Number thirty-six being an inquiry as to whether the warrants sued on in this action were issued and delivered by the village to the defendant well company as and for payment for the construction of the well dug under the first contract, to which the jury answered, "Yes," and to which no other answer could have been made, there being no conflict whatever in the testimony, and the pleadings of all parties admitting the same. The same is likewise true of question number thirty-seven, an inquiry as to whether the defendant well company on December 16, 1905, or at any other time, received or accepted said warrants as and in payment for its construction of said well under the first contract, to which the jury answered, "Yes." Defendant company admits the receipt of the warrants in payment, and its indorsement of them to plaintiffs, and pleads the same, so no issue was joined on this question. Question number thirty-nine was

an inquiry as to whether any consideration inured or moved to the defendant well company in consideration of its indorsement of said warrants, which was answered in the affirmative, and which, under the undisputed testimony on this point, could not have been answered in any other way. The court could have properly directed the jury to answer said question in the affirmative.

The foregoing is an analysis of the testimony bearing on the questions under review, and as illustrating that the court could at the close of the testimony have directed a general verdict in favor of the plaintiff, and against the defendant well company, and for dismissal of the village and its officers, and dismissal of the counterclaim of the well company against the village, and so summarily have disposed of the case. The reason why this was not done probably was that no motion therefor was made by either counsel for the village or the plaintiff, they evidently preferring to have a judgment rendered on verdict rather than on motion.

It is obvious then that the objections leveled at the alleged errors in submitting certain questions to the jury for their determination, and in fact all questions involving the validity of the verdict, cannot be considered as error, as no other verdict could have been rendered under the testimony and pleadings in the action than the one found. Under such condition of the record, the action of the trial court denying the motion of the defendant well company that the court direct the jury to find in its favor was proper. Likewise, for the same reasons, was the ruling on certain motions to strike and answer certain of said questions immaterial. Hedderick v. Hedderick, 18 N. D. 488, 123 N. W. 276.

But one further question remains for consideration, and that is, that the verdict was not signed by the jury. Counsel for the appellant urges that because of this omission the verdict is void. The question arises under the statute, Rev. Codes § 7031, providing, in trials of civil actions, "the verdict must be in writing, signed by the foreman, and must be read by the clerk to the jury, and the inquiry made whether it is their verdict." While the statute is positive and requires by its terms the verdict to be signed by the foreman of the jury, the same statute is generally held to be directory, and not mandatory, and the verdict is valid without being signed.

In Berry v. Pusey, 80 Ky. 166, the court's opinion reads: "This

provision of the Code [requiring signing of the verdict] is merely directory, particularly in civil cases, and certainly the objections come too late after the jury has been discharged. The jury . . . heard the special interrogatories read . . . . and the verdict was then handed to the clerk and again read by him, and the jury asked if it was their verdict, and an affirmative response was made. The verdict was then entered of record and made the judgment of the court, and is binding on the parties to it."

As our procedure is identical with Kentucky as to practice and statutory requirements in this respect, and as no objection was made that the verdict was unsigned on its return and until long thereafter, the remarks of the court above quoted apply; the two cases being identical as to facts.

The statutes of Missouri, § 6269 of 1889, are the same as ours in this respect, requiring the verdict to be signed, and that court in Gurley v. O'Dwyer, 61 Mo. App. 348, holds: "That [while] the universal practice in common-law courts for centuries has required such verdicts to be in writing, and to be signed by the foreman of the jury, . . . [yet] an unsigned verdict is not void." That a motion in arrest of judgment will not lie on that account, and such Code provisions are directory merely, citing Morrison v. Overton, 20 Iowa, 465; Burton v. Bondies, 2 Tex. 203; Hardy v. State, 19 Ohio St. 579; see also to same effect, Harrison v. Singleton, 3 Ill. 21; Gary v. Woodham, 103 Ala. 421, 15 So. 840; Maloney v. Harkey, Ga. Dec. pt. 2, p. 159; Harris v. Barden, 24 Ga. 72; Miller v. Mabon, 6 Iowa, 456; Menne v. Neumeister, 25 Mo. App. 300.

Indiana, however, holds to the contrary. Trout v. West, 29 Ind. 51; Noakes v. Morey, 30 Ind. 103; Sage v. Brown, 34 Ind. 470.

In Louisiana, the Constitution requires that the verdict be recorded on the minutes in English, and under the construction of this constitutional requirement, that state holds the verdict must be signed. Dubertrand v. Laville, 8 La. 274.

Had the attention of the court been directed by motion or otherwise to the absence of the foreman's signature to the verdict prior to the discharge of the jury, undoubtedly the defect would immediately have been cured by the court requiring such signature.

A verdict, like all other court proceedings, should be construed in furtherance of justice, and not be defeated by a statute intended only

to prescribe uniform procedure, when such verdict is otherwise regular, responsive, sufficient, and just. The holding of many courts that such a statute is directory, and the verdict valid, furnishes ample precedent, and we sanction such interpretation by so holding.

This disposes of all questions submitted. Accordingly the judgment appealed from is affirmed.

All concur, except MORGAN, Ch. J., not participating.